**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| ROCKNE "ROCKY" MILLER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-CV-04233-MDH |
| | ) | |
| ELIZABETH ZIEGLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Before the Court are the parties cross-motions for summary judgment. The Court has reviewed all briefing and the matter is now ripe for review. For reasons herein, Defendants' Motion for Summary Judgment is **GRANTED** and Plaintiff's Motion for Summary Judgment is **DENIED**. Summary judgment is entered in favor of Defendants.

## BACKGROUND

In 2018, more than sixty-two percent of Missouri voters passed a constitutional amendment referred to as Clean Missouri, which generally seeks to strengthen Missouri's lobbying and campaign finance laws. This reform included Mo. Const. art. III, § 2(a) (the "Lobbying Ban") or ("the Ban"). The Lobbying Ban reads in relevant part as follows.

> After December 6, 2018, no person serving as a member of or employed by the general assembly shall act or serve as a paid lobbyist, register as a paid lobbyist, or solicit prospective employers or clients to represent as a paid lobbyist during the time of such service until the expiration of two calendar years after the conclusion of the session of the general assembly in which the member or employee last served and where such service was after December 6, 2018.

1

Defendants are the Executive Director and Commissioners of the Missouri Ethics Commission (collectively, "MEC"). Plaintiffs consist of Rockne "Rocky" Miller ("Miller"), a former state representative; John LaVanchy ("LaVanchy"), an employee of the General Assembly; and Presidio Environmental LLC ("Presidio"). Plaintiffs argue that the Lobbying Ban deprives them of their First Amendment freedom of speech and right to petition. Plaintiffs allege both facial and as-applied unconstitutionality. Plaintiffs bring their constitutional claims through 42 U.S.C. § 1983 and seek, *inter alia*, to have this Court declare the Lobbying Ban unconstitutional as well as compensatory or nominal damages.

Miller is a licensed professional engineer. He is experienced in environmental engineering. Miller was elected state representative for Missouri's 124th district in 2012 and served in the Missouri House of Representatives from 2013 to 2021. Miller was reelected for a two-year term in November 2018, the same election at which the Lobbying Ban was enacted. Miller is therefore subject to the Lobbying Ban, which became effective in December 2018. Miller chose to take the oath of office for his new term in January 2019 agreeing to uphold the Missouri Constitution, aware that the Lobbying Ban was now a part of the Constitution.

In November 2021, while still an elected officeholder, Miller was approached by Presidio, which wished to hire Miller to lobby officials in Missouri's executive and legislative branches. The proposed lobbying required knowledge of the legislative and regulatory process, as well as expertise in environmental engineering. However, Presidio's goals required Miller to serve as both an "executive lobbyist" and a "legislative lobbyist" under Mo. Rev. Stat. § 105.470. Miller drafted a contract which set forth how much Miller would have been compensated to act as lobbyist for Presidio. Miller did not register as a lobbyist, paid or otherwise, and did not act as a lobbyist on

behalf of Presidio, because he believes that conduct would have violated the Lobbying Ban. As of January 2023, Miller is no longer subject to the Lobbying Ban.

LaVanchy began working as a legislative assistant to Missouri State Representatives Shane Roden and Andrew McDaniel in December 2017 and January 2014, respectively. As of January 2023, LaVanchy works as a committee records specialist in the General Assembly. In his capacity as a legislative assistant, LaVanchy testified that his duties included performing research for the representatives, scheduling meetings with lobbyists, and having some level of control over who accesses the representatives. LaVanchy also occasionally attended committee meetings in place of representatives and made certain legislative recommendations to representatives. Because LaVanchy remains an employee of the General Assembly, he is subject to the Lobbying Ban.

All Plaintiffs argue that the Lobbying Ban is an unconstitutional burden on their right to freedom of speech and right to petition. Plaintiffs admit the Lobbying Ban only prohibits lobbying that is *compensated* and that they may therefore engage in any lobbying activities so long as they are not paid pursuant to the requirements of the Lobbying Ban. Plaintiffs also acknowledge the Lobbying Ban lasts only two years and allows various paid activities, other than lobbying. Missouri statute, for example, includes a list of seventeen specific activities that explicitly fail to count as lobbying and therefore do not implicate the Lobbying Ban. These include: "responding to any request for information made by any public official or employee;" preparing or publishing any "editorial, a newsletter, newspaper, magazine, radio or television broadcast, or similar news medium;" and "testifying as a witness before the general assembly or any committee." Mo. Ann. Stat. § 105.470(5)A. Further, apart from the specific exceptions to lobbying carved out within the Missouri statute, the Lobbying Ban fails to capture any other post-legislature employment one may seek apart from employment that meets the narrow statutory definition of lobbying. The Lobbying

Ban, for example, does not apply to post-legislature paid work as a consultant, an advisor, or counsel. Defendants' expert indicates the majority of states have some version of a Lobbying Ban in place. (Doc. 73-2 at 4).

## STANDARD OF REVIEW

Summary judgment is proper where, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1359 (8th Cir. 1993). "Where there is no dispute of material fact and reasonable fact finders could not find in favor of the nonmoving party, summary judgment is appropriate." *Quinn v. St. Louis County*, 653 F.3d 745, 750 (8th Cir. 2011). Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets the initial step, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). To satisfy this burden, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

### I. Does the Lobbying Ban burden constitutional rights?

It is axiomatic that "laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored

4

to achieve that interest." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) (citations omitted). A threshold question therefore is whether the Lobbying Ban imposes a burden on Plaintiffs' constitutional rights. Plaintiffs argue that the Lobbying Ban imposes a burden, because the First Amendment "treats the ability to pay for advocacy as advocacy itself." (Doc. 74-1 at 20). This burden exists in the Lobbying Ban's express prohibition of payment for certain types of speech as well as the inability of Miller and LaVanchy to register as paid lobbyists without risking prosecution. (Doc. 74-1 at 22). Plaintiffs argue that this burden applies to both those who pay for the political speech, like Presidio, as well as those who receive payment for speech like Miller and LaVanchy. (Doc. 74-1 at 21). Defendants argue the Lobbying Ban imposes no burdens on Plaintiffs' constitutional rights, as the Lobbying Ban prohibits only payment and profit in exchange for certain types of speech. (Doc. 73 at 11-13). While Plaintiffs have a right to free speech, Defendants argue, they do not have a constitutional right to be paid for and profit from such speech. (Doc. 73 at 11-13).

The U.S. Constitution provides, "Congress shall make no law…abridging the freedom of speech…or the right of the people to petition the Government for a redress of grievances." U.S. Const. amend I. The First Amendment of the Constitution applies to the states through the Fourteenth Amendment. *Thornhill v. State of Alabama*, 310 U.S. 88, 95 (1940). The First Amendment protects lobbying. *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n*, 389 U.S. 217, 221 (1967). "The First Amendment protects individuals not only from direct and outright bans on speech, but also indirect actions the government might take to 'abridge' the central freedom to speak freely in the democratic process." *Ted Cruz for Senate v. Fed. Election Comm'n*, 542 F. Supp. 3d 1, 9 (D.D.C. 2021), *aff'd sub nom. Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2022). The Supreme Court previously struck down a state law criminalizing the payment of

5

people who gathered signatures in support of certain petitions. *Meyer v. Grant*, 486 U.S. 414, 422-23 (1988) (state law unconstitutional when it constricts ability to collect necessary number of signatures and reduces size of challengers' audience). The Supreme Court also struck down an honoraria ban that "broadly prohibits federal employees from accepting any compensation for making speeches or writing articles…even when neither the subject of the speech or article nor the person or group paying for it has any connection with the employee's official duties." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 457 (1995). A Federal District Court in Ohio found a lobbying ban for former legislators implicated first amendment protections for members of the Ohio General Assembly. *Brinkman v. Budish*, 692 F. Supp. 2d 855, 861 (S.D. Ohio 2010). Unlike the Missouri law, however, the Ohio ban prohibited both paid and unpaid lobbying.

Though Plaintiffs are correct that First Amendment jurisprudence, particularly following the Supreme Court's decision in *Citizens United*, blurs the distinction between advocacy and the ability to pay for it, the text of the First Amendment nonetheless does not protect the ability to receive payment for expression of speech. The Lobbying Ban is unconcerned with Miller and LaVanchy's ability to express a particular message, political or otherwise. Rather, the focus of the Lobbying Ban remains limited to the receipt of payment for lobbying. In *Meyer*, the Supreme Court noted that, "it is often more difficult to get people to work without compensation than it is to get them to work for pay." *Meyer* at 1893. While this is plainly correct, an important distinction persists between the presence of a burden and the absence of an incentive. It is at least arguable that to read into the text of the Constitution a prohibition on any law that simply prohibits incentivizing speech, constitutes an expansion of the free speech abridgement protections the Framers had in mind.

Plaintiffs' argument as to the implications of First Amendment protections, however, proves different with respect to Presidio than with Miller and LaVanchy. Though the specific language of the Lobbying Ban at issue targets former legislators who seek to "act or serve as a paid lobbyist" for a period of two years after they leave office, this of course implicates those like Presidio who may desire to pay for services of the former legislators. Though the Lobbying Ban does not subject Presidio to a threat of prosecution, the law does make it functionally impossible for Presidio to pay Miller to act as a lobbyist during the protected period and receive services for which it paid. It does this by prohibiting Miller from accepting payment for lobbying activities. Presidio is not, however, in any way prohibited from hiring a lobbyist generally. Rather, Presidio is prohibited from hiring as a lobbyist only someone employed by the General Assembly during the previous two years. Any burden on Presidio, therefore, remains limited.

## II.     The Lobbying Ban targets a compelling government interest

Plaintiffs argue that, because the Lobbying Ban imposes a burden on First Amendment free speech rights, this Court must apply a strict scrutiny test to evaluate the constitutionality of the law. Under a strict scrutiny standard, courts look to whether the challenged law furthers a compelling state interest. *Missourians for Fiscal Accountability v. Klahr*, 892 F.3d 944, 952 (8th Cir. 2018). Defendants argue that the appropriate standard is exacting scrutiny, where the inquiry becomes whether the challenged law is narrowly tailored to serve a significant government interest. Exacting scrutiny is appropriate where the law in question does not burden speech, but merely requires disclosure. *Klahr* at 949-50. Defendants argue exacting scrutiny applies when the challenged law is content neutral, "even if the law has an incidental effect on some speakers or messages but not others." (Doc. 73 at 17). Plaintiffs respond arguing the lobbying ban is neither

content nor speaker neutral, as it specifically targets lobbying rather than other types of speech by some former public officials. (Doc. 85 at 8-10).

### a. The Lobbying Ban targets *quid pro quo* corruption and the appearance thereof, compelling government interests.

The Supreme Court has found that, in the context of preventing corruption, a compelling government interest exists only in targeting *quid pro quo* corruption and the appearance thereof. *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192 (2014) (citations omitted). The Supreme Court has clarified that *quid pro quo* corruption refers to "the notion of a direct exchange of an official act for money." *Id*. Put differently, "The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *Id*. (citations omitted). Defendants argue the Lobbying Ban targets *quid pro quo* corruption and its appearance. Plaintiffs in response argue that the Lobbying Ban takes aim at access-and-influence, rather than *quid pro quo* corruption. Access-and-influence, Plaintiffs argue, fails to constitute a compelling government interest under Supreme Court precedent. (Doc. 85 at 16-18).

This Court finds the Lobbying Ban takes aim at *quid pro quo* corruption and its appearance. This view appears generally consistent with the Court's decision in *Brinkman*, which found Ohio's ban on compensated lobbying targeted *quid pro quo* transactions, while the ban on uncompensated lobbying did not. *Brinkman v. Budish*, 692 F. Supp. 2d 855, 863-64 (S.D. Ohio 2010). As Defendants' expert notes, post-employment restrictions for legislatures like the one at issue here generally aim to, *inter alia*, "prevent current public officials from being influenced in their public actions in anticipation of—either implicit or explicit—future employment, a situation that results

in *quid pro quo* corruption." (Doc. 73-2 at 5). She also notes that reducing the appearance of such corruption is another common goal of post-employment restrictions. (Doc. 73-2 at 5).

It is also apparent from the Lobbying Ban's text alone that the Ban targets *quid pro quo* corruption and its appearance, rather than only influence and access. The Ban specifically limits its scope to paid lobbying activities, rather than lobbying that a former public official may undertake on a *pro bono* basis. This is consistent with the Supreme Court's finding that a *quid pro quo* transaction involves the exchange of a political favor for money. *McCutcheon* at 192. The Ban applies for only two years after a public official departs office, the period during which the official's relationships with former colleagues remain strongest. This reduces what former public employees may provide in the way of influence, decreasing desirability as paid lobbyists.

Plaintiffs further contend that former public employees lack an ability to provide a *quo*, as they cannot grant official acts by virtue of their status as former rather than current employees. (Doc. 78 at 38). This view, however, reflects a limited understanding of the design of the Lobbying Ban. The Lobbying Ban does not influence only post-legislature activities of those who fall under its purview. Rather, the Lobbying Ban also seeks to deter current public officials from granting official acts and other political favors in exchange for future money in the form of post-legislature lobbying contracts. (Doc. 73-2 at 5). Further, the Supreme Court has emphasized that *quid pro quo* corruption includes "political favors," not only "official acts." *McCutcheon* at 192.

Plaintiffs contend "the summary judgment record proves LaVanchy [the legislative assistant] has no power to grant favors." (Doc. 85 at 23). Plaintiffs further argue "the only *quo* Defendants allege LaVanchy can offer is "access to decisionmakers,'" which fails to rise to a compelling governmental interest. (Doc. 85 at 23). This view again, however, reflects a narrow understanding of the nature of a *quid pro quo* transaction. The Supreme Court's view of a such a

transaction emphasizes a political favor or official act in exchange for money. *McCutcheon* at 192. The Court does not specify that special access to a decisionmaker or public official cannot constitute the type of political favor involved in a *quid pro quo* transaction. A legislative aide's granting meetings in exchange for a future promise of paid lobbying, for example, would seem to constitute a rather textbook example of the very type of *quid pro quo* interaction discussed in *McCutcheon*. Further, LaVanchy's role as an aide involved various other activities that indicate additional *quos* beyond access including attending committee meetings in place of legislators and making legislative recommendations to legislators. (Doc. 22 at 34-35). Because aides like LaVanchy make legislative recommendations to elected officials, ample opportunity exists for aides to recommend a certain vote on proposed legislation in exchange for future lobbying employment. This too constitutes a rather textbook example of *quid pro quo* corruption.

### b. Record evidence shows the Lobbying Ban furthers the government interest

Plaintiffs argue that Defendants have failed to provide record evidence sufficient to show the Lobbying Ban furthers a compelling government interest. "Because the Government is defending a restriction on speech, it must do more than simply posit the existence of the disease sought to be cured; it must instead point to record evidence or legislative findings demonstrating the need to address a special problem." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1641 (2022) (citations omitted). Nonetheless, the fit between the state interest and the means must be reasonable and proportional, not necessarily perfect. *See Free & Fair Election Fund v. Missouri Ethics Comm'n,* 903 F.3d 759, 765 (8th Cir. 2018) ("Although the fit between the interest served and the means selected need not be perfect, it must be reasonable, with the means selected proportionate to the interest served.") (citations omitted). In support, Plaintiffs cite to the parties'

joint stipulation, wherein the parties agree, *inter alia*, that Defendants have not located evidence of "any complaints regarding violations of the Lobbying Ban, a similar statutory provision (R.S. Mo. § 105.455), or related conduct." (Doc. 53).[1] Plaintiffs are correct that documented violations of the constitutional provision at issue may speak to the Lobbying Ban's ability to further a compelling state interest. It is arguable, however, lack of documented violations of the Lobbying Ban suggest that the Ban effectively deters public officials from engaging in the *quid pro quo* exchange the Lobbying Ban seeks to prevent.

Defendants' expert cites a 2022 New Mexico case where two top state regulators, not subject to any lobbying ban, joined a cannabis consulting firm within months of leaving state employment. (Doc. 73-2 at 2). Defendants' expert also cites a 2019 Michigan case where a state-level official registered as a lobbyist for a business association a mere two days after leaving state office. (Doc. 73-2 at 2). While Missouri's Lobbying Ban would fail to capture these cases in other states, they nonetheless remain instructive as to the prevalence of the types of *quid pro quo* transactions the Lobbying Ban seeks to prevent. The brief period between these officials' departure from public office and their engagement in lobbying for private sector firms, reasonably gives rise to the appearance of a *quid pro quo* transaction. A former public official's acceptance of a lobbying position months or even days after departing government, makes reasonable the belief that those officials may have exchanged political favors for their positions—and salaries—as lobbyists. The appearance of impropriety is a reasonable and natural conclusion in such a situation. Transitioning quickly from legislator to paid lobbyist in Missouri was not unusual prior to the enactment of the

---

[1] The parties' stipulation also states that Defendants do "not possess any evidence (testimonial or documentary) of MEC's compelling/substantial interest in the Lobbying Ban." (Doc. 53). Defendants' intent as to this statement remains unclear, given they argue throughout their briefing that evidence does exist in the form of the expert's opinion and the prior prosecution involving Bob Griffin. For purposes of this summary judgment order, this Court has considered the documentary evidence in the record as well as Defendants' briefing.

challenged law. This is evidenced by former Representative Kevin Corlew, who, after losing reelection in November 2018, reportedly resigned his position early before the Lobbying Ban took effect in December 2018. (Doc. 14 at Ex. 7). The Corlew case provides a direct example of the deterrent effect of the Lobbying Ban. In the instant matter, Presidio approached Miller about lobbying on Presidio's behalf in November 2021, while Miller remained an elected representative. Like the cases cited above, this sequence of events would also reasonably give rise to the appearance of *quid pro quo* corruption, should Miller have quickly started working as a paid Lobbyist for Presidio.

Defendants cite to former Speaker of the House Bob Griffin, convicted during the 1990s of bribery and mail fraud for a scheme that involved Griffin receiving payments from a lobbyist in exchange for Griffin recommending that members of the construction industry hire the lobbyist to advocate for an upcoming tax bill. (Doc. 73 at 22). Plaintiffs seek to discount this evidence, claiming Griffin's conduct would not have been covered by the Lobbying Ban. (Doc. 78 at 37). While the Lobbying Ban may not have captured Griffin's conduct, prior instances of *quid pro quo* corruption remain relevant. The mere existence of *quid pro quo* corruption generally, shows a need for law and policy that take aim at specific types of *quid pro quo* corruption. Put differently, the mere presence of *quid pro quo* corruption evidences a need to take steps to safeguard the public from politicians exchanging official acts or political favors for money. When a particular measure to reduce *quid pro quo* corruption, like the Lobbying Ban, would fail to capture certain past examples of *quid pro quo* corruption, like the Griffin case, this does not indicate that the policy measure fails to further the government interest of reducing *quid pro quo* corruption and its appearance.

This position finds support in the Supreme Court's emphasis not only on *quid pro quo* corruption alone, but also on its appearance. *McCutcheon* at 192. As Plaintiffs argue, "the line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights." *McCutcheon* at 209. The line between *appearance* of *quid pro quo* corruption and general influence may occasionally be even vaguer. The possibility of such vagueness, however, is not license to avoid the difficult work of differentiation. Nor is it license to entirely forego Supreme Court precedent which makes plainly clear that the state has a compelling interest in preventing *quid pro quo* corruption and, separately, *its appearance*. *See McCutcheon* at 191-92 ("The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute. Our cases have held that Congress may regulate…to protect against corruption *or the appearance of corruption*…Any regulation must…target what we have called "*quid pro quo*" corruption or its appearance.") (emphasis added). The Lobbying Ban reduces public officials' opportunities to engage in *quid pro quo* transactions. Fewer opportunities for *quid pro quo* transactions involving public officials, renders less widespread the appearance of such conduct. That the appearance of *quid pro quo* corruption remained a significant problem in Missouri specifically, finds further support in the fact that more than sixty-two percent of Missouri voters passed the Lobbying Ban.

### c. Prophylaxis upon prophylaxis

Courts generally disfavor laws that prevent conduct already prohibited by other law and regulation. *See, e.g., Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1653 (2022) ("Such a prophylaxis-upon-prophylaxis approach…is a significant indicator that the regulation may not be

13

necessary for the interest it seeks to protect."); *Free & Fair Election Fund v. Missouri Ethics Comm'n*, 903 F.3d 759, 765 (8th Cir. 2018) (prophylaxis-upon-prophylaxis approach requires courts to be "particularly diligent in scrutinizing the law's fit"). Plaintiffs argue the Lobbying Ban constitutes a prophylaxis-upon-prophylaxis, because multiple provisions of Missouri statute already cover the behavior prohibited by the Lobbying Ban. In support, Plaintiffs cite Mo. Rev. Stat. §§ 105.452, .453, .454, which variously prohibit bribery and other forms of corruption among people currently serving as public officials. While these statutes prohibit a variety of acts including *quid pro quo* transactions, their scope remains limited to public officials currently in office. Their text also fails to plainly prohibit political favors or official acts for which payment in the form of lobbying income is delayed until after the official no longer holds office. Plaintiffs also cite Mo. Rev. Stat. § 105.455, which prohibits certain public officials from registering as lobbyists for six months following departure from public office. While § 105.455 is similar to the Lobbying Ban, it differs in terms of scope. The Lobbying Ban imposes a two-year waiting period and applies to a broader range of public employees. Differences in scope also suggest prosecution and enforcement of the Lobbying Ban will in some instances be more successful than the prosecution of § 105.455 violations. The Lobbying Ban's two-year duration further reflects less tolerance on the part of Missouri voters for *quid pro quo* corruption and its appearance, compared with the General Assembly, which passed § 105.455 in 2016.

### III.     The Lobbying Ban is narrowly tailored

To be narrowly tailored as required by the Constitution, "a law must be the lease restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014). If courts fail to find that a particular law is the most efficient means to achieve the compelling state

interest, "we reaffirm simply and emphatically that the First Amendment does not permit the State to sacrifice speech for efficiency." *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc*., 487 U.S. 781, 795 (1988). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative*." United States v. Playboy Ent. Grp., Inc*., 529 U.S. 803, 813 (2000) (citations omitted). Plaintiffs argue that the Lobbying Ban fails to be narrowly tailored because it is both underinclusive and overbroad. The Ban is overbroad, Plaintiffs argue, because the Ban prohibits all forms of lobbying for a period of two years. (Doc. 78 at 41-42). Simultaneously, Plaintiffs contend the law is underinclusive because it fails to capture all activities that may reasonably lead to *quid pro quo* transactions and their appearance. (Doc. 78 at 44). Such under-inclusiveness suggests, Plaintiffs contend, the challenged law fails to further a compelling government interest. (Doc. 78 at 43). Defendants argue generally that the law is narrowly tailored because it targets only paid speech, applies only to legislators and their employees, and focuses only on advocacy. (Doc. 73 at 24-28).

Under Missouri statute, someone may qualify as one of either four types of lobbyist: legislative, judicial, executive, or elected local government official. Mo. Rev. Stat. § 105.470. The definition varies somewhat by category, but generally meeting the statutory definition of lobbyist requires one to seek to influence the behavior or decisions of Missouri government officials. *Id*. The Lobbying Ban does not distinguish among various types of lobbyists, prohibiting legislators and their staff members from qualifying as any type of the four statutorily-defined categories of lobbyist. Mo. Const. art. III, § 2(a). This application is consistent with its purpose of preventing *quid pro quo* corruption and its appearance.

The Lobbying Ban is narrowly tailored. The Ban prohibits strictly paid lobbying activities, leaving untouched any unpaid lobbying activities anyone under the Ban's purview may want to

15

undertake. Any pro-bono lobbying for the benefit of a non-profit organization, for example, remains entirely untouched by the Ban. This constitutes a significant departure from Ohio's lobbying ban at issue in *Brinkman*, which prohibited both paid and unpaid lobbying. This limitation is further consistent with the Lobbying Ban's focus on *quid pro quo* transactions, which necessarily involve the exchange of money for political favors and official acts. The Ban applies only to General Assembly employees. Other Missouri statutes dictate that those who work in the Capitol building and lack direct access to the elected officials who hold significant decision-making power, are not employees of the General Assembly. Janitors, gift shop clerks, and mail carriers, for example, are employees of the Office of Administration's Division of Facilities Management, Design, and Construction. Mo. Rev. Stat. §§ 8.051, 8.110. Members of the Capitol Police Department are employed by the Department of Public Safety, while museum employees are part of the of the Department of Natural Resources. Mo. Rev. Stat. §§ 37.120, 184.010. Limiting the scope of the Lobbying Ban to members of the General Assembly and those with greatest access to those members, reflects the Lobbying Ban's emphasis on *quid pro quo* transactions and their appearance rather than access and influence alone.

Further, as Defendants highlight, the Missouri legislature in 2020 carved out another statutory exception to the definition of legislative lobbyist. This new provision exempts from the definition of lobbyist anyone who serves as a "legislative liaison," a state employee hired to communicate with members of the General Assembly on behalf of other divisions of state or local government. Mo. Rev. Stat. § 105.470(5)A. This shift also reflects the Lobbying Ban's focus on *quid pro quo* transactions, recognizing the risk of exchanging political favors for money is lessened when one is employed by another governmental entity rather than a private sector firm or organization.

Plaintiffs argue the Lobbying Ban is underinclusive because it fails to apply to all types of conduct that may reasonably give rise to *quid pro quo* corruption and its appearance. (Doc. 85 at 29). Testifying to the General Assembly, acting as a paid consultant, and responding to a request for information are all activities that fall outside the scope of the Lobbying Ban. See Mo. Ann. Stat. § 105.470(5)A. Yet, Plaintiffs argue, like lobbying itself, these activities may give rise to *quid pro quo* corruption and its appearance. In support, Plaintiffs highlight the Court's reasoning in *Brinkman*, which found Ohio's lobbying ban to be "under-inclusive because it does not restrict other behaviors or activities of former members of the General Assembly that might give rise to actual or perceived corruption, such as the acceptance of gifts or offers for employment unrelated to lobbying." *Brinkman* at 865.

As Defendants acknowledge, however, many of the specific types of employment allowed under the Lobbying Ban do not implicate *quid pro quo* concerns in a manner comparable to lobbying. Testifying on someone's behalf to the General Assembly, for example, involves a certain level of transparency absent from the act of exerting influence over a public official's decisions, a process that occurs almost necessarily behind closed doors. Similarly, employment as a consultant does not involve the same level of concern about *quid pro quo* risk as a lobbyist, as consulting relies on one's expertise and skillsets rather than political connections developed while a public official. Plaintiffs' general emphasis on any under-inclusivity is somewhat inconsistent with their prophylaxis-upon-prophylaxis argument, as various other parts of Missouri statute deter and capture some of the *quid pro quo* conduct Plaintiffs suggest the Lobbying Ban fails to prohibit due to a too narrow scope. The text of § 105.455, for example, prohibits all lobbying and reduces risk of *quid pro quo* corruption and its appearance among executive-branch officials who remain untouched by the Lobbying Ban.

Plaintiffs argue the Lobbying Ban is overbroad also because it fails to distinguish between various types of lobbying. Put differently, the Lobbying Ban fails to differentiate between lobbying within sectors in which the former public official worked while in office and those sectors with which he or she had no political connection. In support, Plaintiffs cite *Treasury Employees* for the proposition that the federal government's honoraria ban's "blanket burden on the speech of nearly 1.7 million federal employees requires a much stronger justification than the Government's dubious claim of administrative convenience." *United States v. Nat'l Treasury Emps. Union*, 115 S. Ct. 1003, 1017 (1995). On this point, the honoraria ban at issue in *Treasury Employees* is distinguishable from the Lobbying Ban. The Supreme Court noted that, "With few exceptions, the content of respondents' messages has nothing to do with their jobs and does not even arguably have any adverse impact on the efficiency of the offices in which they work. They do not address audiences composed of co-workers or supervisors; instead, they write or speak for segments of the general public." *Id.* at 1012. In contrast, the Lobbying Ban specifically targets speech with a nexus to the political connections of former government officials.

Unlike the honoraria ban, the Lobbying Ban is generally concerned with speech directed toward people with whom former public officials developed a political connection during their time in the General Assembly. In this sense, the Lobbying Ban is more narrowly tailored toward *quid pro quo* corruption and its appearance than the honoraria ban, which imposed a far more sweeping limitation. This crucial difference also calls into question the precedential value of *Treasury Employees* generally. Though this case and *Treasury Employees* broadly involve payment for speech, the types of speech at issue are wholly distinct. Because lobbying involves using political connections to influence decisions, lobbying more than other types of speech bolsters the appearance of *quid pro quo* corruption. This is amplified when the lobbyist financially

18

profits from the influence he has exerted. These concerns remained absent from the honoraria ban in *Treasury Employees*, in which the speech at issue "involved content largely unrelated to [the plaintiffs'] government employment." *Treasury Employees* at 466. In the present case, the speech at issue inextricably links to the employment as public officials. If not for one's time as a General Assembly employee, the profitable connections with legislators would never have been made and the lobbying therefore would never occur. This distinction is significant because it separates Plaintiffs' situation from nearly all the precedent they cite. While axiomatic that lobbying is constitutionally protected, lobbying more than other types of speech necessarily implicates concerns about *quid pro quo* corruption and its appearance. This concern is all the more intense when the lobbying at issue is done for monetary profit.

Plaintiffs further contend that the record lacks evidence for this Court to find the Lobbying Ban's two-year duration furthers the *quid pro quo* goals. For support, Plaintiffs cite *Brinkman*, in which the Court found, "Defendants have not established that the danger of *quid pro quo* corruption or the appearance of corruption is significantly lessened if the former legislator is permitted to lobby the General Assembly one year and one day after leaving the legislature." *Brinkman* at 864. Missouri voters clearly thought otherwise, voting overwhelmingly in favor of the two-year ban as a reasonable and strategic effort to reduce *quid pro quo* corruption and its appearance among employees of the General Assembly. Further, Defendants' expert indicates that the two-year timeframe is common among states with similar statutes. (Doc. 73-2 at 11). The expert also explains that the "two-year ban in effect in the U.S. Senate was partly driven by the desire to align the timeframe with the duration of a congressional session." (Doc. 73-2 at 10). A similar rationale applies to Missouri's Lobbying Ban, where state representatives are elected every two years. Accordingly, the Lobbying Ban's two-year duration furthers efforts to target *quid pro*

19

*quo* corruption and its appearance, as it allows for some turnover among elected state representatives prior to allowing former public officials to work as paid lobbyists.

This Court finds that the restriction imposed by more than sixty-two percent of Missouri voters is analogous to the myriad other longstanding and legally-upheld restrictions on speech that are narrowly tailored to further compelling state interests. The Ban's brief prohibition on the profit former politicians can receive from lobbying is akin to other bans like lawyers' inability to discuss openly certain aspects of a client's case and former employees' inability to disclose trade secrets to a new employer. Also related is the requirement that lawyers avoid representation of certain clients, for pay or otherwise, if such representation reasonably creates the appearance of impropriety. Similar too is the requirement that judges refrain from political activity and speech. The constitutionality of the Lobbying Ban is also supported by principles that underlie the reasoning in the *Pickering-Connick* line of cases, where the Supreme Court has found that restrictions on public employees' speech may be constitutional when such speech interferes with professional duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951, 1958, 164 L. Ed. 2d 689 (2006) ("So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."). While the Lobbying Ban targets former public officials, it nonetheless operates from the position that, "when a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti* at 418. By finding that the state has a compelling interest in preventing *quid pro quo* corruption and its appearance, the Supreme Court has suggested that presence of such corruption and its appearance counteract the efficient and effective operation of legislative bodies.

Seen in this light, the Lobbying Ban's restrictions are but another example of a reasonable, proportional, and narrow limit designed to further a most important state interest: combating *quid pro quo* corruption and its appearance. Not every restriction on speech violates the First Amendment. Finally, it remains unclear to this Court why any duly elected representative would take an oath to uphold the Missouri Constitution, knowing fully well the effect of the Lobbying Ban, and nonetheless claim an infringement of First Amendment rights. An important and indispensable fact of this dispute is that a conscious decision was made to accept the responsibilities of public office that included a two-year limit on the profit that one could obtain in exchange for lobbying. This fact further differentiates the instant case from genuine violations of the First Amendment. Public service requires personal sacrifice.

## CONCLUSION

For foregoing reasons, Defendants' Motion for Summary Judgment is **GRANTED**. Plaintiffs' Motion for Summary Judgment is **DENIED**. Summary judgment is entered in favor of Defendants.

**IT IS SO ORDERED.**

Dated: March 30, 2023                                  */s/ Douglas Harpool*
                                                        **DOUGLAS HARPOOL**
                                                        **United States District Judge**